[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action brought by the Plaintiff wife against the Defendant husband for dissolution of their marriage on the ground of irretrievable breakdown. The parties were married on November 30, 1991, in Irvington, New York. The parties have one minor child issue of the marriage: Samantha Rose Saccomano, age 8, born August 29, 1993.
The parties appeared at trial and each testified. The court observed their demeanor and evaluated their credibility. In addition, the court reviewed and considered the exhibits, sworn financial affidavits, claims for relief, proposed orders and trial memoranda. Based upon the evidence, the court makes the following findings.
This action was commenced on June 26, 2000. The court has jurisdiction, and all statutory stays have expired. The marriage has irretrievably broken down and judgment may enter dissolving the marriage on this ground.
The Plaintiff is 49 years old and in good health. For a period of time in the late 1970s, the Plaintiff lived as part of a commune on a compound CT Page 14744 in Jamaica, east of Kingston. During this time she had her first child, Chandra Simon. At approximately age 27, she returned to New York with Chandra, then 2 years of age. They lived with her parents, and she returned to her studies at Columbia University. She received both a bachelor's and master's degree from Columbia University in nursing and midwifery, respectively. Chandra was 14 when the Plaintiff and the Defendant married, and is now 23.
In approximately 1986, faced with the financial issues of a single parent and the long hours demanded in her field of work, the Plaintiff started a new career as a stockbroker, obtained numerous required licenses, and is now a First Vice President at a large brokerage firm.
The Defendant husband is 60 years old and in good health. He has a bachelor of science degree from Fairfield University. He had been a stockbroker for six years as of the date of this marriage and had been successful in this profession.
When the parties married in 1991, both parties were working and both contributed to the care of and expenses for the Plaintiff's 14 year old daughter, Chandra Simon. In 1993, the parties' daughter, Samantha, was born. At this time, the Plaintiff was employed at Smith Barney, in New Haven. Eight weeks after Samantha's birth, the Plaintiff returned to work and brought Samantha with her each day. After four months, the Plaintiff enrolled Samantha in a day care center located within her office building. After work, both parties shared in the normal household chores and the required care for Samantha.
The Plaintiff brought no assets into the marriage other than an old Toyota and a few antiques. At time the parties married, the Defendant was living in a rented cottage in Westport, and he brought no assets of any consequence into the marriage. Except for one short period during which they maintained a joint savings/checking account to pay expenses, the parties kept their assets separate and their bank accounts in their own names. The joint account had proved impractical because both made withdrawals from the account, thereby making accurate balance information difficult. Early in their marriage, the parties filed two or three joint tax returns, but after tax liens were filed for Defendant's failure to withhold proper amounts or make required quarterly deposits they filed separate returns. The delinquent amount for which the lien was filed was approximately $20,000.
Prior to the marriage, the Plaintiff had been living in a house located at 6 Elizabeth Drive, Westport, purchased in February 1986 by her father, Fred Grossman. After one rent free year, she paid her father rent and collected rent from a tenant who occupied a portion of the premises CT Page 14745 and who also provided care for Samantha. Shortly before their marriage, the Defendant moved in with the Plaintiff and the monthly rent payment to her father was increased. Initially, the Defendant paid the rent and the Plaintiff and Defendant shared the rest of the household expenses. At that time, the Defendant earned more than the Plaintiff and therefore, for at least several years, paid a greater share of these expenses. The average gross earnings of the parties for the following time frames were: for the first year of their marriage, 1991, the Defendant's approximately $110,000 and the Plaintiff's $27,255, in 1993, Defendant's $135,000 and the Plaintiff's $59,800, and for 1997 the Defendant's was $166,000 and the Plaintiff's $125,000. In the year 2000, the Plaintiff's income surpassed the Defendant's, approximately $220,500 to $157,200.[1]
Earnings to date for 2001 indicate that the Plaintiff's income will be significantly more than the Defendants. For the purposes of issues of alimony and support, it is the parties net income that is the relevant figure and the Plaintiff's net income in 2001 will be more than the Defendant's.
In September, 1992, the Plaintiff's father quitclaimed the house to himself and the Plaintiff. The Defendant continued making rent payments. In October 1993, the Plaintiff and her father took out a $196,300 mortgage, and her father received all of the proceeds. The Plaintiff characterizes this transaction as a sale to her of a one-half interest in the property, the price for her share being the $196,300 mortgage proceeds.[2] After this refinance by the Plaintiff and her father, the Defendant made the majority of mortgage payments, yet the Plaintiff took the tax deductions on her personal return for the interest and received refunds as a result.
In February, 1999, the Plaintiff purchased a vacation home in Stone Ridge, New York. This property was purchased in her name alone, with $22,000 from her savings account and with $50,000 from her father. Although her father now claims that his contribution was a loan, the absence of a note, mortgage or terms for repayment make this claim incredible.
Warning signs of potential problems for this relationship came early on. A $20,000 tax deficiency and lien in the first years of this marriage certainly should have alerted the Plaintiff and indicated the' need for investigation and action. However, both parties were consumed with their own agendas, issues and desires thereby allowing the situation to deteriorate without attention. The defendant was gambling, but the impact was, for the most part, limited to his finances because of the segregation of assets and separate bank accounts. The Plaintiff's attention was devoted to her work, her home, and her children. She failed to provide to the Defendant the much needed assistance to control and CT Page 14746 conquer his addiction to gambling.
The Plaintiff claims the cause of the breakdown was the Defendant's failure to commit to stop gambling and that the breakdown was not in any way her fault, but such is not the case. This action was commenced on June 26, 2000, almost one year after the Defendant stopped his gambling with the assistance of the Gambler's Anonymous program. The Plaintiff provided no assistance or support for the Defendant's efforts to overcome his addiction and made no real effort to save this marriage after the Defendant ceased gambling in the summer of 1999. The Plaintiff's lack of commitment to this marriage, lack of support to and for the Defendant, and lack of interest in saving this marriage played a significant part in its breakdown.
The Defendant also bears a considerable share of the responsibility for the breakdown. The Defendant's gambling had a significant effect on the parties' finances. However, the lack of expert testimony as to the extent, timing or the nature of the Defendant's problem makes it difficult to apportion blame. Neither party introduced evidence as to when and if the Defendant's gambling changed from a form of entertainment! hobby to a psychological addiction, what was the cause of the disorder, what could or should have been done to control or end the problem, what part, if any, did the Plaintiff's behavior play in relation to the illness, what is the likelihood that the current Gamblers Anonymous program will succeed, what effect will the Plaintiff's lack of support have on the likelihood that the Defendant will revert to his prior behavior, and what additional support and/or treatment will be needed.
The Plaintiff has acknowledged that the Defendant was a compulsive gambler. The DSM-IV-TR[3] classifies pathological gambling as an impulse-control disorder "characterized by recurrent and persistent maladaptive gambling behavior." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed., Text Revision, 2000) p. 663. "The essential feature of Impulse-Control Disorders is the failure to resist an impulse, drive, or temptation to perform an act that is harmful to the person of others." The DSM-IV-TR describes the associated descriptive features, course, differential diagnosis, and diagnostic criteria for "Pathological Gambling". Id., 671-74
The Defendant's behavior evidenced certain, but not all, indicia of this recognized disorder, at some time during the marriage.[4] Both parties acknowledged that, for some period during the middle years of this marriage, the Defendant was addicted to gambling, a compulsive gambler. However, both parties have very different views of orders which would be CT Page 14747 appropriate in light of this behavior. The Plaintiff seeks to have the court reduce the Defendant's share of property distribution by the dollars lost gambling and by the amount of income lost as a result of both the absence from work and lost income which would have resulted from investments of this income and money. The Plaintiff seeks to punish the Defendant for the losses caused by his illness and to have the related costs treated differently than similar costs associated with a physical illness or incapacity. This court does not believe it appropriate to do so. The Plaintiff's claims for relief; in effect, ask this court to disregard the fact that these parties were married for some ten years, and, again, the court believes it would be inequitable to do so.
The Defendant suggests, on the other hand, that the court disregard these losses, and resulting debts, because they are the result of a mental disorder. Both mental and physical illnesses can significantly impact the lives and finances of those they affect. Both parties acknowledged the addiction did exist for some period. The court is entitled to, and will, consider the problems, financial and otherwise, shown to have been caused by this addiction, but will not penalize the afflicted party for the resulting costs. Rather, the court will evaluate this circumstance together with all evidence as it and they relate to the factors required by General Statutes § 46b-81 (a).
The future holds much promise for both parties. Each has the ability to earn significant income and the opportunity to acquire future assets. Plaintiff, 49 years old and eleven years younger than the Defendant, has additional prime earning years. Her income is presently greater than the Defendant's. There exists, however, a significant difference in the present financial condition of the parties. The Plaintiff's financial affidavit indicates total assets of $415,577.20 and liabilities of $92,500, which includes the $50,000 debt to her father with no repayment schedule. The fair market value of one of her assets, a one-half the equity in the 6 Elizabeth Drive, Westport residence, is higher than indicated on her affidavit. Based on the appraisals submitted by the parties, the court finds that the fair market value of the property to be $505,000 and the Plaintiff's share $130,024, $40,000 more that shown on her affidavit. The value of the Plaintiff's total assets is therefore found to be $455,577.
The Defendant's picture is quite different. The total value of his assets, as of September 11, 2001, is approximately $20,100 and his liabilities are $332,000.
Many of the figures presented on the parties' financial affidavits, including the amounts expended for business expenses, recreation, vacations and charitable contributions, lacked substantiation and were CT Page 14748 not credible. The Plaintiff's joint account with her father is the property of her father and is not a marital asset.
ORDERS:
The court has carefully considered the statutory criteria and the applicable case law in reaching the decision reflected in the orders that follow.
1. Dissolution — The marriage of the parties, having broken down irretrievably, is hereby dissolved.
2. Custody — The parties will share joint legal custody of their minor child, with primary physical custody to the Plaintiff, with liberal and flexible rights of visitation to the Defendant, all in accordance with the provisions of the agreement of the parties (Parenting Plan) dated May 23, 2001.
3. Lump Sum Alimony — The Plaintiff shall pay to the Defendant by way of lump sum alimony the sum of one hundred thousand ($110,000), sixty thousand dollars ($60,000) of which shall be paid on or before December 1, 2001, and the remaining fifty thousand dollars ($50,000.) shall be paid or before May 1, 2002. No award of periodic alimony is made to either party.
4. Child Support — The Defendant shall pay to the Plaintiff mother child support in the amount of $300 per week for the minor child until the minor child shall attain the age of eighteen years or graduates from high school, whichever later occurs, but not beyond her nineteenth birthday. The combined net income of the parties is in excess of the highest income level of the Guideline schedule and this order is permitted and appropriate under the circumstances of this case. Child Support and Arrearage Guidelines, Preamble § (d)(7), p. iii. An Immediate Wage Withholding shall issue unless the parties agree in writing to a Contingent Wage Withholding.
5. Assets — The parties shall equally divide jewelry and those items of personal property currently in the home at 6 Elizabeth Drive, Westport, Connecticut. In the event of any dispute, the parties shall mediate the issues before Family Relations. In the event they are unable to reach an agreement, they may return to court for further hearings and orders on this issue.
As to all other assets listed on the parties' financial affidavits, submitted at trial, the parties shall each retain their respective interest in, ownership of; and title to each asset which they presently CT Page 14749 own and is so reflected on their financial affidavits. The Defendant shall vacate the premises at 6 Elizabeth Drive, Westport, Connecticut on or before December 1, 2001. Plaintiff shall provide the Defendant reasonable access thereafter for removal of personal property. The Defendant shall be responsible for and shall pay any outstanding mortgage payments for the premises up to and through the November 2001 payment.
6. Liabilities — The $15,000 debt which the Plaintiff alleges is owed to her by the Defendant was never agreed or intended to be an enforceable obligation is hereby released and forgiven.
As to all other liabilities, each party shall be solely liable for all liabilities shown on their respective financial affidavits, and shall hold the other harmless from any claim or demand thereon.
7. Attorneys Fees — Each party shall pay and be responsible for their own attorneys fees.
8. Medical Insurance and Day Care — Plaintiff shall provide, at her expense or through her employment, health insurance for the minor child. Uninsured medical and dental expenses and reasonable and necessary work related day care costs for the minor child shall be shared equally by the parties.
9. Life Insurance — The Defendant shall maintain life insurance with a face value of $200,000 with the minor child as beneficiary, in full force and effect, for so long as he shall be obligated to pay child support pursuant to this decision. The Plaintiff shall maintain, in full force and effect, her presently existing life insurance policies with the minor child as one-half beneficiary. Both parties will exchange, forthwith, documentation from their respective insurance carriers to confirm compliance with and the existence of said insurance.
10. Contempt — The court makes no finding of contempt regarding car insurance as requested by the Defendant.
Judgment will enter in accordance with
HILLER, J.